Thurman, J.
A majority of the court are of the opinion that, the agreements, or new conditions, of September 17,1846, November 3, 1846, and June 19, 1847, indorsed upon the complainants’ mortgage, and attested and acknowledged as deeds are required to be, and recorded, constituted, respectively, valid liens upon the property named in the mortgage, for the purposes and to the extent specified in the agreements; in other words, that each of these agreements is to be considered as a new mortgage of the date when it was delivered for record.
For myself, I entertain doubts, which are shared by my brother Corwin, whether this ruling is correct. The inclination of our minds is otherwise. Our- objections go both to the instruments, themselves and to the record. A mortgage is a grant of an estate upon a condition. This distinguishes it from those simple pledges which pass no title, but only create a lien. Now, here, the premises were granted by the mortgage, but upon the condition specified in it, and upon no other. No estate was granted by the agree *107 ments or either of them. There is not a word of grant in them. They are attempts to superadd conditions to that expressed in the mortgage, and upon which the estate was convoyed. Can this bo done ? I doubt it. It is admitted that each agreement must be treated as a new mortgage. But it seems to me that to constitute a new mortgage, it was necessary to convey the premises upon the new condition. A conveyance of an estate seems to me indispensable to create a mortgage.
Neither do I think that the record of these agreements is sufficient. The agreements of themselves do not show what mortgage is referred to in them. This is only made certain by the fact that they are indorsed upon the mortgage. The mortgage is thus made-a part of them, and should have been recorded as a part of each of them. Instead of this, the agreements only.are recorded. It is true the mortgage was recorded when it was given, and there-is, in the margin of *the record of the two first agreements, a reference made by the recorder to the record of the mortgage. But a mere reference is not a recording. Each agreement made a new mortgage, it is said. But, as before shown, the original mortgage must be taken as a part of each agreement, for without it the latter is senseless. They should, therefore, have been recorded together ; otherwise, a part only of the new mortgage is recorded. But a record of a part only of a deed is not constructive notice, and, as actual notice to the defendants is not shown, I doubt whether they can be prejudiced by these agreements, even were they valid as new mortgages. A majority of the court, however, think differently, and have ruled as I have before stated.
The other points made in the case require us to construe the act. “to create a lien in favor of mechanics and others, in certain, cases,” passed March 11, 1843, 41 Ohio L. 66. The task is by no-means an easy one, for we are unaided by any previous construction of the Supreme Court, and the act is so loosely drawn as to-be open to constructions very different, or, indeed, quite opposite. We have therefore given it much consideration, and have finally, though not without difficulty, arrived at conclusions that are satisfactory to us all. These conclusions are—
1. That the word “ owner,” in the first section of the act, is not limited in its meaning to an owner of the fee, but includes also ah owner of a leasehold estate. If the ownership is in fee, the lien is-upon the fee; if it is of a less estate, the lien is upon such smaller' *108 -estate. To hold that an owner in fee only is meant, would be directly subversive of the policy of the act, and in a great degree render it useless.
2. That by the words “lot of land upon which the same shall stand,” in the same section, is not meant merely the ground covered by the building ; nor do they necessarily confine the lien to 'the particular lot, as known on the town-plat, on which the building stands. On the contrary, where, as in the present instance, two adjacent town-lots are used, without any actual division „between them, as one mill-lot, a *part of the buildings and machinery being upon one, and a part upon the other, the lien expends to both lots, though the precise spot where the work was done may be within the limits of one of them. And the case is .the same whenever two or more adjacent lots are thrown into one lot, the ideal lines of division being disregarded, and used for a common purpose, whatever that purpose may be. What is the territorial extent of the lien, when a dwelling, barn, or the like is built or repaired upon a farm, we do not decide. That question is not now presented, and we confine our decision to the points that Arise in this case.
3. In order to acquire the lien provided by the first section of the act, the labor must be performed, or materials furnished, “ by virtue of a contract or agreement with the owner” of the building. "The section so declares, and by this is meant not simply to exclude volunteers (persons who may labor without being employed, or may furnish materials without their being purchased); for such cases seldom, if ever, happen : and should they happen, they would -create no debt. But there can be no lien unless there is a debt, and it would therefore be idle to presume an intention to guard against liens that could never exist for want of a debt to support them.
By “contract,” then, is meant-something more than a mere agreement to do work or sell goods. The contract mentioned in the section is one that has reference to the purpose for which the work is to be done, or materials furnished, namely, the erection, alteration, or repair of a craft or building. True, the particular building, or craft, may not be in the minds of the parties when the contract is made, and yet a lien may arise, as if a builder should be employed to erect a house, the plan or site of which was not ■determined; or, to construct such buildings or water-crafts as the *109 employer might thereafter wish constructed; or, to make such-alterations or repairs as might be required; or, as if a material-man agree to furnish materials, or a laborer to perform work, under similar contracts; in all these cases, and perhaps others that. *might be mentioned, the statute gives a lien, although the particular building or vessel may not have been designated when the contract was made. Eor, though not mentioned, it is nevertheless embraced by the agreement, and the agreement relates to the !1 constructing, altering, or repairing ” named in the act.
But the case is quite otherwise, where the contract has no such relation. Should a man’s domestic patch a window or mend a lock' in his employer’s house, or a farmer’s hired man make or repair a door of his barn, no one would say that a lien attached in either case. So, if a material-man sell his wares with'no understanding, express or implied, as to their application, he can assert no lien-upon the building or vessels in which they may be placed. He-trusts to the responsibility of the buyer alone and takes no security. He sells, not for the special purpose named in the statute of “ constructing, altering, or repairing,” but for any purpose that may seem best to the buyer. But it is only where the materials are-furnished for a purpose named in the act that a lien is acquired. That they are so furnished, may be proved by evidence of an express agreement, or by proof of circumstances from which the purpose may be inferred. A tacit understanding may be as. good-’ as an express one.
4. The lien dates from the commencement of the labor or of the-furnishing of the materials. There is no distinction in this respect between laborers and material-men. A literal reading of section' 7 might seem to postpone the lien of the latter to the time when the furnishing of materials is completed, but such is not the design-of the act. Section 1 makes no distinction between them, nor was it intended by section 7 to do so.
To hold, as is claimed by complainants’ counsel, that the lien-dates only from the filing of the account, would be consistent with neither the letter nor the policy of the law. And, so far as we know, it would be directly opposed to the uniform construction given to it ever since its enactment.
*5. Where materials are furnished, from time to time, for a particular purpose, as, for instance, the construction of a house,, *110 .and the dates are so near each other as to constitute one running account, the lien dates from the time when the first article was supplied, although, strictly speaking, the articles were not furnished under one entire contract.
6. But where they are furnished for different purposes, as, for instance, a part of them for constructing a house and the residue at a subsequent time, for altering or repairing it, or whore there are intervals of time in the account so long that it can not, with propriety, bo called one account, there is not, in the absence of an entire contract, a lien for the whole from the date of the first arti- ■ cle furnished. The items must bo regarded as constituting two or more distinct accounts, as the case maybe; as, for instance, the materials supplied for constructing the house as making one account, those subsequently furnished for repairing it as forming another ; or those supplied before the supposed interval of time, as eon■stituting one account, and those subsequently furnished, as another. And to each of these accounts the rules heretofore stated will apply. We do not, however, mean to say, that where alterations,and repairs are going on at or about the same time, the account must be divided. Nor that there must be a division where the alteration ■or repairs are made immediately after the erection, so as .to plainly ■constitute but one account.
7. The lien does not override or interfere with prior bona fide liens. The idea that the builder or material-man may have a lien upon the house, to the exclusion of the mortgagee or judgment ■creditor, whose lien attached before the house was erected, altered, or repaired, is inadmissible, and could not, in practice, be carried ■ out. Where the house was erected after the mortgage was given, ■or judgment rendered, it might possibly be practicable to value the ground and house separately, sell them tegether, and apportion the proceeds of the sale according to the appraisements. But where the house existed at the date of the mortgage or judgment, and *was subsequently altered or repaired, it would, in a multitude of cases, bo impracticable to ascertain how much its value was thereby enhanced, or whether it was enhanced at all. The ■statute contemplates no such division of the property. It provides that “ this law shall not be so construed as to interfere with prior bona fide liens on grounds on which such building or buildings ■shall be erected, if a fixture.” But the construction claimed would plainly interfere with the lien of a prior mortgagee. As the law *111 ¡stood before the enactment of the code, a mortgagee had a right to a strict foreclosure, if the property at two-thirds of the appraisement would not satisfy his debt. But of what avail would this right be unless ho could get possession ? And how could he get possession or the ground covered by the house if a paramount lien upon the building had intervened ? • So a purchaser under a judgment acquires all the right and title which the judgment debtor had at or subsequent to the time when the judgment became a lien upon the land. Of course, ho acquires a right of possession if the debtor had it. But how can ho get possession if the building, altering, or repairing a house, subsequent to the date of the judgment lien, has created a paramount incumbrance upon the house ? ■
We do not suppose that the law relating to mortgages, or to judgments and executions, was in any way affected by the enactment of the lien law. And we are of opinion, as before stated, that liens under this law do not, in any case or in any manner, interfere with prior bona fide liens.
8. As between the lienholders, under the statute we are construing, there is no priority. This ruling is contrary, perhaps, to the opinion that has commonly prevailed, and may seem in conflict with the maxim that, other things beiug equal, he who is first in time is stronger in law. But, after much reflection, we are .satisfied it is the right construction, and the only one that will do justice. It is nowhere expressly provided in the act that there ■shall be priority. On the contrary, some of its provisions are ■clearly irreconcilable with such an idea. Thus, section 10 provides that where *the lienholders have obtained judgments, but are unable to sell the property upon execution, because the ■owner has but an equitable estate, the court, upon the fact being-made to appear, shall direct the officer who has returned, or who is authorized by law to serve the execution, to rent or lease the building, or buildings, until the rents and issues thereof shall pay ■and satisfy the several, liens on which judgments may be had against the same; “ provided this law shall not be so construed as to interfere with prior bona fide liens on the grounds on which such building or buildings shall be erected, if a fixture.’-’
Now, here, the mind of the legislature was called to the subject of priorities, and they carefully guarded prior liens from the operation of the act. But yet they made no provision for priority ■among the lienholders under the act. It may be replied that the *112 section requires the property to be rented until they are all paid. This is true; but if priority of lien was intended, would there not-have been a provision for priority of payment ?
The next section, however, contains something more than a negative pregnant upon this point. It provides for renting the property to which the owner has a legal title, if it will not sell on execution, and expressly directs that the money thereby produced “shall be distributed to the several lienholders interested in said judgments in proportion to their several demands.”
Here, then, we have a mode of payment prescribed—a mode that rejects all idea of priority among the lienholders, and, on the contrary, distributes the money pro rata. Will it be said that there is one mode for the distribution of the rents and another for the proceeds of a sale—that there is priority as to the latter, though it is prohibited as to the former ? The answer is, that nothing in the statuto.warrants such a distinction, and it has no foundation in-reason. If there is priority in the one case, there should bo in the other; if a pro rata distribution is right in the one case, it is right in both.
* Again: The idea upon which the law proceeds is, that the building is the result of the labor and materials of various persons—material-men, stone-masons, bricklayers, carpenters, painters, etc. The work of some of these must precede that of others, but each contributes his proper share to the value of the-structure. Its value, when finished, is derived from these several contributions. It is not the product of one man’s materials, or anothoi man’s labor, but is the result of the contributions of all. All, then, should share its proceeds, if it go to sale. There is no good reason why the man who, of necessity, or by accident, begins before-another, should have priority. The painter and glazier may add far more to the value of the building than the mason who merely lays the foundation; yet, if priorities exist, he may get nothing whatever, while the latter is fully paid. The bricklayer and carpenter usually commence at the same time; and if priorities are allowed, the accident of one beginning a day before the other, may give him a ruinous advantage. In any view we can take of the subject, we can come to no other conclusion than that the legislature intended the money, whether arising from rents or sales, to-be distributed pro rata.
9. It is next to be considered what distribution is to be made *113 where there is an intervening incumbrance that is inferior to some of the liens, but superior to the rest. Thus: if A and B commence work, or the furnishing of materials, and afterward the owner mortgages the premises to C, and after this D and E begin to work or to furnish materials, here A and B have priority over O, and C has priority over D and E; yet, if 0 were out of the way, there would be no priority among the others. In such a case A and B must receive what they would be entitled to if C’s mortgage had no existence; the residue must be applied to the satisfaction of the mortgage; and whatever may remain after that, must be distributed to D and E pro rata.
The case before us is not sufficiently prepared to enable us to render a final decree at this time, upon the proofs and *exhibits on file. We can not say what part, if any, of the complainant’s claim is covered by the original mortgage, and what parts fall under the several extensions. We are unable to tell when some of the indebtedness occurred—a fact that is of great importance, as we suppose the principle of the decision in Spader v. Lawler, 17 Ohio, 371, to be applicable to this case. Greenwood’s sworn account is sufficiently proved, and his lien upon lots 22 and 23 established; but whether he or the complainants have priority, can not, for the reasons above stated, be decided. There is no proof of Gregory, Burnet & Co’s account and some of the others. The case must, therefore, stand referred to a master, with leave to the parties to-take testimony, and with instructions to the master to report in-accordance with the rulings herein made.